

ACCEPTANCE OF PLEA

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3

4     UNITED STATES OF AMERICA

5          VS.                    CRIMINAL NO. JFM-93-0419

6     MUMIN SAHIB ABDULLAH
      COREY LORENZO WOODFOLK
7
                  DEFENDANTS
8

9
                                   Baltimore, Maryland
10
                                   September 13, 1994
11

12
           The above-entitled case came on for
13
      rearraignment before the Honorable J. Frederick
14
      Motz, Chief Judge
15

16
                  A P P E A R A N C E S
17

18    For the Government:

19         Susan M. Ringler, AUSA
           Andrea Smith, AUSA
20

21    For Defendant Abdullah:

22         Michael Kaminkow, Esquire

23    For Defendant Woodfolk:

24         George McDowell, Esquire

25    Gail A. Simpkins, RPR
      Official Court Reporter

P R O C E E D I N G S

1
2      THE COURT:  Ms. Ringler?

3      MS. RINGLER:  Your Honor, the government calls

4  the case of United States versus Philip Edward Roberson

5  and Corey Lorenzo Woodfolk, JFM-93-0419.  We are here

6  this afternoon, Your Honor, for the purpose of

7  rearraigning Mr. Roberson and Mr. Woodfolk on Count 1

8  of the second superseding indictment.

9      THE COURT:  All right.  Ms. Turner?

10     THE CLERK:  Would you both please rise and raise

11  your right hands?

12     (The defendants affirmed.)

13     THE CLERK:  I would like to start with Mr.

14  Woodson, please.

15     DEFENDANT WOODFOLK:  Woodfolk.

16     THE CLERK:  Woodfolk, I am sorry.

17     Would you please state your name for the record?

18     DEFENDANT WOODFOLK:  Corey Lorenzo.

19     THE CLERK:  Would you state your age and your

20  date of birth?

21     DEFENDANT WOODFOLK:  I am 25 years old, 3/9/69.

22     THE CLERK:  Sir, previously you were arraigned

23  before the United States Judge Magistrate.  At that

24  time you pled not guilty to Counts 1, 2, 5, 7 and 10 of

25  the second superseding indictment.  Do you wish to

3

```
 1    change your plea at this time.
 2            MR. MCDOWELL:  To Count 1, yes, ma'am.
 3            THE CLERK:  You wish to plead guilty to Count 1;
 4    is that correct, sir?
 5            DEFENDANT WOODFOLK:  Yes, ma'am.
 6            THE CLERK:  You maintain not guilty to the other
 7    counts; is that correct, sir?
 8            MR. MCDOWELL:  Yes.
 9            THE COURT:  How do you plead guilty to Count 1 in
10    the case?  I didn't hear you.  How do you plead guilty
11    to Count 1?
12            Mr. Woodfolk, how do you plead guilty to Count
13    1?
14            DEFENDANT WOODFOLK:  Oh.  I said guilty.
15            THE COURT:  I am sorry.  I didn't hear you.  Go
16    ahead.
17            THE CLERK:  Mr. Roberson --
18            MR. KAMINKOW:  Your Honor, before we begin as to
19    Mr. Roberson, he would like the court record to reflect
20    that his legal name is Mumin Sahib Abdullah and would
21    like to be referred to as that, and not Roberson.
22    Roberson was the name he was given at birth, but he has
23    legally changed his name.  Is that correct, sir?
24            DEFENDANT ABDULLAH:  Yes, sir.
25            MR. KAMINKOW:  And would like to be referred to
```

4

1    by what the indictment refers to as also known as, but

2    is his proper name, which is his proper name.

3         THE COURT:  Thank you.

4         THE CLERK:  Mr. Abdullah, would you just state

5    your name for the record?

6         DEFENDANT ABDULLAH:  Yes, ma'am, Mumin Sahib

7    Abdullah.

8         THE CLERK:  Your age and date of birth, sir.

9         DEFENDANT ABDULLAH:  I'm 37, 9/1/57.

10        THE CLERK:  I'm sorry?

11        DEFENDANT ABDULLAH:  9/1/57.

12        THE CLERK:  Sir, previously you were arraigned

13   before the United States Magistrate, and at that time

14   you pled not guilty to Counts 1, 2, 3, 4, 6, 8 and 9 of

15   the second superseding indictment.  Do you wish to

16   change your plea at this time?

17        DEFENDANT ABDULLAH:  Yes, ma'am.

18        THE CLERK:  How do you wish to plead?

19        DEFENDANT ABDULLAH:  Guilty to the first count of

20   conspiracy.

21        THE CLERK:  Guilty to Count 1; is that correct

22   sir?

23        DEFENDANT ABDULLAH:  Yes.

24        THE CLERK:  You maintain you are not guilty for

25   the remaining counts?

1    DEFENDANT ABDULLAH:  Yes, ma'am.

2    THE COURT:  Mr. Abdullah, Mr. Woodfolk, before I

3    accept your pleas, I need to be satisfied of certain

4    things, so I am going to ask your some questions.  What

5    I will do is ask, to the extent it is a common

6    question, I will ask it to you both and Mr. Abdullah, I

7    ask you to answer first; Mr. Woodfolk, I ask you to

8    answer second, please.

9    If you do not understand any of my questions, do

10   not hear any of my questions or have any questions

11   whatsoever about my questions, please let me know, all

12   right?

13   DEFENDANT ABDULLAH:  Yes, sir.

14   DEFENDANT WOODFOLK:  Yes, sir.

15   THE COURT:  Do each of you understand that you

16   are under oath, so that if you knowingly give a false

17   answer to any question, you could be prosecuted for

18   perjury?

19   DEFENDANT ABDULLAH:  Yes.

20   DEFENDANT WOODFOLK:  Yes, Your Honor.

21   THE COURT:  Now, how far have each of you gone in

22   school.  Mr. Abdullah?

23   DEFENDANT ABDULLAH:  I have been to college a few

24   semesters.

25   THE COURT:  Mr. Woodfolk?

```
 1              DEFENDANT WOODFOLK:  College, Your Honor.

 2              THE COURT:  Beg your pardon?

 3              DEFENDANT WOODFOLK:  College.

 4              THE COURT:  In the last 24 hours, have you taken

 5      any drugs?

 6              DEFENDANT ABDULLAH:  No, sir.

 7              DEFENDANT WOODFOLK:  No, Your Honor.

 8              THE COURT:  Have you consumed any alcohol?

 9              DEFENDANT ABDULLAH:  No.

10              DEFENDANT WOODFOLK:  No.

11              THE COURT:  Are you satisfied with the services

12      that your counsel have given to you in this case?

13              DEFENDANT ABDULLAH:  Yes, I am.

14              DEFENDANT WOODFOLK:  Yes, I am.

15              THE COURT:  Now I am going to describe for each

16      of you what the charge is to which you are pleading

17      guilty and ask each of you, when I am finished, if you

18      understand the elements that I state of what the

19      government would have to prove if the case went to

20      trial.

21              If this case did go to trial, the government

22      would have to prove that beginning on or in the time,

23      in the approximate time stated in the indictment, which

24      is January of 1991 to January of 1994, you agreed with

25      one another, and perhaps others, to distribute a
```

1  kilogram or more of a mixture containing a detectable
2  amount of cocaine.

3      This is a conspiracy count. The government would
4  have to prove that you conspired, that you agreed with
5  at least one other person, and here it is each of you
6  plus, you could agree with one another and/or with
7  other people, that each of you entered this agreement
8  knowingly and voluntarily, that you knew not only that
9  the substance being distributed was --

10     MS. RINGLER: It is heroin, Your Honor, not
11 cocaine.

12     THE COURT: Excuse me. If I said cocaine, I
13 meant heroin, that you knew it was heroin. To be found
14 guilty of this offense, the government would also have
15 to prove that you knew that the amount involved was a
16 kilogram or more.

17     The government would have to prove that someone
18 who was part of this agreement or conspiracy took what
19 is called an overt act under the law, that is a step to
20 further the object and purposes of the conspiracy, and
21 that at least one of those steps is outlined here, one
22 of these overt acts is outlined in the, is as stated in
23 the indictment, and for purposes for what is called
24 venue, that is for bringing the case here in Maryland,
25 that one of those overt acts would have to have been

8

1    taken here in Maryland.

2        Do you understand that is what the government

3    would have to prove if the case went to trial?

4        MR. KAMINKOW:  Mr. Abdullah has one question.

5        THE COURT:  Yes, sir.

6        MR. KAMINKOW:  That was what did Your Honor mean

7    when you said that you would have to know that you were

8    distributing more than a kilo?

9        THE COURT:  That would be an element of the

10   offense being pled guilty to.

11       MS. RINGLER:  He would have to know that during

12   the --.

13       THE COURT:  What I mean is -- but an element of

14   the offense is a kilogram or more is involved, right?

15       MS. RINGLER:  That is correct.

16       THE COURT:  Correct me if I am wrong, the

17   government would have to prove that you would know,

18   that either yourself or that someone who was part of

19   this conspiracy, it wouldn't have to be yourself, but

20   you would have to know that as part and during the

21   period of this conspiracy, essentially a kilogram or

22   more of heroin was being distributed.

23       DEFENDANT ABDULLAH:  Yes, sir, I understand

24   better now.

25       THE COURT:  Mr. Woodfolk, do you understand what

1    I stated to be the elements of the offense?

2         DEFENDANT WOODFOLK:  Yes.

3         THE COURT:  Mr. Abdullah, thank you for asking a

4    question.  If you have any questions, I want you to ask

5    me.  I don't mean to be frowning.  If I frown in

6    answering, it is not because I am upset, it is because

7    I am trying to make, I am working to make sure that you

8    understand.

9         DEFENDANT ABDULLAH:  Yes, sir.

10        THE COURT:  Do you understand that the maximum

11   penalty to which you are subject under the applicable

12   statute, maximum sentence to which you are applicable

13   is life imprisonment, and if it was something less than

14   life, or life with some kind of credit given after you

15   received the life imprisonment, a term of supervised

16   release of five years?

17        I put it that way because it sounds a little

18   silly to say life imprisonment, followed by a term of

19   supervised release of five years.  If it is less than

20   life or if part of the sentencing credits would lend to

21   you getting out, but essentially the maximum would be

22   life imprisonment, followed by a term of supervised

23   release of five years, a fine of four million dollars,

24   plus a $50 special assessment.

25        Do you understand that that is the maximum to

```
 1    which you would be subject under the applicable
 2    statute?
 3              DEFENDANT ABDULLAH:  Yes, sir.
 4              DEFENDANT WOODFOLK:  Yes, Your Honor.
 5              THE COURT:  Do you understand that some of those
 6    things are also minimums.  You have to be sentenced to
 7    at least ten years imprisonment, that is a mandatory
 8    statutory minimum, plus the $50 special assessment is a
 9    mandatory minimum.
10          Do you understand that?
11              DEFENDANT ABDULLAH:  Yes, I do.
12              DEFENDANT WOODFOLK:  Yes.
13              THE COURT:  Does anybody remember, other than the
14    guidelines, is there a statutory supervised release
15    mandatory minimum?  There is none to my knowledge.
16              MS. SMITH:  I will check.
17              MR. MCDOWELL:  I believe there is not for
18    conspiracy, sir.
19              THE COURT:  Beg your pardon?
20              MR. MCDOWELL:  There is not for conspiracy.
21              THE COURT:  There is not for conspiracy.  All
22    right.
23              MS. RINGLER:  Just a maximum.
24              THE COURT:  Now do each of you also understand
25    that you are subject to what are called the Sentencing
```

1   Guidelines?

2          DEFENDANT ABDULLAH:  Yes, Your Honor.

3          DEFENDANT WOODFOLK:  Yes, Your Honor.

4          THE COURT:  Do you understand that the Sentencing

5   Guidelines are essentially issued by the United States

6   Sentencing Commission?  It is an agency called the

7   United States Sentencing Commission.

8          Do you understand that?

9          DEFENDANT ABDULLAH:  Yes.

10          DEFENDANT WOODFOLK:  Yes.

11          THE COURT:  Do you understand that the Court --

12   let me back off.

13          Do you understand that the guideline which

14   applies in a particular case depends upon a wide

15   variety of factors.  I can't go through them all with

16   you.  I think when I go through the plea agreement with

17   you, I will go through some of the ones involved in

18   this case in a little more detail, but it does depend

19   upon a variety of factors, which would include the

20   amount of the drug involved, the type of the drug

21   involved.

22          Just glancing through the plea agreement, I see

23   that there may be issues in this case as to whether or

24   not, during the course of the conspiracy, a firearm was

25   brandished, whether or not there has been any

1   obstruction of justice, whether or not there was death

2   resulting from the conduct alleged, whether or not

3   there was significant physical injury resulting,

4   whether there was unlawful restraint of anyone who was

5   killed or injured, whether and to the extent of

6   property loss, and the use of weapons.  These are the

7   kinds of things which -- plus your criminal record --

8   these are the kinds of things which determine what

9   guideline applies.

10          Do you understand that?

11          DEFENDANT ABDULLAH:  Yes, Your Honor.

12          DEFENDANT WOODFOLK:  Yes, Your Honor.

13          THE COURT:  Do you understand that the Court must

14   sentence you within the applicable guideline after all

15   the issues relating to the guidelines have been

16   resolved, unless it finds that there is a particular

17   reason that applies in your case that the Sentencing

18   Commission did not consider or did not consider

19   adequately when it set the guideline.

20          DEFENDANT ABDULLAH:  Yes.

21          DEFENDANT WOODFOLK:  Yes, Your Honor.

22          THE COURT:  Now by pleading guilty, you are

23   giving up some very important rights.  I am sure you

24   know, but I want to review them with you and make sure

25   that you know what they are and that you are

1    voluntarily waiving these rights.

2          Do you understand that you have a right to a

3    trial by jury?

4          DEFENDANT ABDULLAH:  Yes.

5          DEFENDANT WOODFOLK:  Yes, Your Honor.

6          THE COURT:  Do you understand that if you wanted

7    to waive your right to a trial by jury, and the

8    government was willing to waive its right to a trial by

9    jury, you could be tried by a United States district

10   judge?

11         DEFENDANT ABDULLAH:  Yes.

12         DEFENDANT WOODFOLK:  Yes.

13         THE COURT:  Do you understand that in any trial

14   you would have the right to be represented by a

15   lawyer?

16         DEFENDANT ABDULLAH:  Yes.

17         DEFENDANT WOODFOLK:  Yes.

18         THE COURT:  Do you understand that if you could

19   not afford a lawyer, one would be appointed to

20   represent you at the government's expense?

21         DEFENDANT ABDULLAH:  Yes.

22         .DEFENDANT WOODFOLK:  Yes, Your Honor.

23         THE COURT:  Do you understand that at any trial

24   you would be presumed innocent, and the burden would be

25   on the government to prove your guilt beyond a

1    reasonable doubt?

2           DEFENDANT ABDULLAH:  Yes.

3           . DEFENDANT WOODFOLK:  Yes.

4           THE COURT:  Do you understand that in any trial

5    you would have the right to cross-examine, that is to

6    ask questions of everyone who testified against you?

7           DEFENDANT ABDULLAH:  Yes.

8           DEFENDANT WOODFOLK:  Yes.

9           THE COURT:  Do you understand that in any trial

10   you would have the right to compel people to come in

11   and testify on your behalf by having subpoenas issues

12   to them?

13          DEFENDANT ABDULLAH:  Yes, Your Honor.

14          DEFENDANT:  WOODFOLK:  Yes.

15          THE COURT:  Do you understand that if you wanted

16   to, you could take the stand and testify in your own

17   defense?

18          DEFENDANT ABDULLAH:  Yes.

19          DEFENDANT WOODFOLK:  Yes, Your Honor.

20          THE COURT:  Do you understand that on the other

21   hand, if you did not want to testify for whatever

22   reason, no one could force you or compel you to take

23   the stand?

24          DEFENDANT ABDULLAH:  Yes.

25          DEFENDANT WOODFOLK:  Yes.

1    THE COURT:  Do you also understand that if you

2    decided not to testify for whatever reason, no one

3    could draw what the law calls to be an adverse

4    inference from that fact; that is, that no one could

5    infer that you were a bad person, that you were guilty

6    or else anything else bad about your side of the case?

7    Do you understand that.

8            DEFENDANT ABDULLAH:  Yes.

9            DEFENDANT WOODFOLK:  Yes.

10    THE COURT:  Do you understand that if you chose

11    to be tried by a jury, in order to be convicted, your

12    verdict, excuse me, their verdict would have to be

13    unanimous, that they would all have to agree that you

14    were guilty?

15            DEFENDANT ABDULLAH:  Yes.

16            DEFENDANT WOODFOLK:  Yes.

17    THE COURT:  Do you understand by pleading guilty

18    you are giving up each and every one of those rights?

19            DEFENDANT ABDULLAH:  Yes, sir.

20            DEFENDANT WOODFOLK:  Yes.

21    THE COURT:  Do you also understand that you are

22    giving up any right to move to suppress any statements

23    that may have been made, any evidence that was seized,

24    any issues relating to severance, defendants, counts,

25    wiretap issues which were addressed by pretrial

16

1    motions, that all of these kinds of motions, that you

2    are waiving your right to proceed with them; do you

3    understand that?

4              DEFENDANT ABDULLAH:  Yes, sir.

5              DEFENDANT ABDULLAH:  Yes, Your Honor.

6         THE COURT:  Now I also need to be satisfied that

7    you are voluntarily entering this plea.  Has anybody

8    used any force or made any threats against you to get

9    you to enter this plea.

10        DEFENDANT ABDULLAH:  Well, Your Honor, in my

11   situation, when I first got arrested and they said

12   United States of America versus me, I knew I was at a

13   loss right then because there is no way in the world I

14   could win against the United States of America.  I did

15   some things that I shouldn't have done.  Now I am

16   fessing up to them and looking for some mercy.  That is

17   all.

18        THE COURT:  Understanding that is your state of

19   mind, though, has anybody used any force or made any

20   threats against you?

21             DEFENDANT ABDULLAH:  No, sir.

22             DEFENDANT WOODFOLK:  No, Your Honor.

23        THE COURT:  I have here a letter in each of your

24   cases.  Mr. Abdullah, in your case it is number,

25   Government Exhibit Number 2.  Mr. Woodfolk, in your

1     case it is Government Exhibit Number 1 for purposes of

2     this proceeding.

3          On the last page of each of those letters, it

4     appears that each of you have signed that letter.  Of

5     course, I have the original here.  I believe you have

6     copies there.

7          Did each of you read and sign your respective

8     plea letter?

9          DEFENDANT ABDULLAH:  Yes, I did.

10         DEFENDANT WOODFOLK:  Yes, Your Honor.

11         THE COURT:  Right above each of your signatures

12    it says, I have read this agreement and carefully

13    reviewed every part of it with my attorney.  My

14    attorney has explained all of my options to me, and I

15    am satisfied with the legal representation that I have

16    received.  I understand this agreement and I

17    voluntarily agree to it.

18         Is that true?

19         DEFENDANT ABDULLAH:  Yes.

20         DEFENDANT WOODFOLK:  Yes, Your Honor.

21         THE COURT:  Let me state what I understand the

22    terms of the plea agreement to be, and I will start

23    with Mr. Abdullah, to the extent appropriate.  Mr.

24    Woodfolk, I will ask you to listen carefully as I go

25    through these because to the extent they are the same,

18

1    I will simply incorporate by reference what I asked

2    him.

3          Mr. Abdullah, I now address you.  You agree to

4    plead guilty to Count 1, as you are doing, Mr.

5    Abdullah.  You and the government then enter into a

6    stipulation or an agreement as to what the appropriate,

7    at least what some of the appropriate guideline factors

8    are for purposes of sentencing.

9          You understand that even as to the ones you do

10   agree, I will ask you that now, right now, that I am

11   not bound by that.  Indeed, I am duty bound to sentence

12   you to the facts as I find them to be.

13         Do you understand that?

14         DEFENDANT ABDULLAH:  Yes, sir.

15         THE COURT:  I ask you, Mr. Woodfolk, the same.

16         DEFENDANT WOODFOLK:  Yes.

17         THE COURT:  The base offense level is 32 because

18   at least one kilogram, and not more than three

19   kilograms, are involved.

20         There is also an agreement that there should be a

21   three-level increase in your case, Mr. Abdullah,

22   because of your role in the offense.

23         It is also agreed that if you admit to conduct

24   set forth in the second superseding information,

25   indictment, excuse me, and that you are cooperative and

1    truthful with the Probation Department as to that

2    conduct, then you will be entitled to a three-level

3    reduction in the offense level.

4         Let me ask counsel for a minute, and it may be

5    that it is meant to be written this way, I just want to

6    make sure.  When you say admitted -- excuse me.  I

7    think I said the word conduct.  What I should have said

8    was the word drug conduct.

9         MR. KAMINKOW:  That is right.

10        MS. RINGLER:  Just to clarify, Your Honor --

11        THE COURT:  You don't need to clarify.  It was

12   that issue that I wanted to hone in on.

13        The only thing that you need for acceptance of

14   responsibility is to accept the so-called drug conduct,

15   which I take it would be things related to the

16   distribution of the drugs themselves.

17        MR. KAMINKOW:  That is correct, Your Honor.

18   There are certain overt acts alleged in Count 1, which

19   both of these defendants deny any responsibility for

20   and assert that they did not do.  For purposes of this

21   plea, they admit their responsibility for the drug

22   activity alleged in Count 1, and only the drug

23   activity.

24        THE COURT:  Anything you want to add?

25        MR. KAMINKOW:  We wanted to make sure that the

1    Probation Department did not take the position that

2    because they may not be admitting to some other

3    conduct, they have not cooperated and been truthful

4    with the Probation Department and thus, would not be

5    entitled to acceptance of responsibility.

6         THE COURT:  I understand that position.  It would

7    seem to follow that to the extent that, at least to the

8    extent that there are guideline factors in dispute that

9    you want to have litigated, that is the only way to

10   leave open the possibility of litigating those issues.

11        MR. KAMINKOW:  That is correct, Your Honor.

12        MS. RINGLER:  Your Honor, that is a fair

13   statement.  What is in dispute is the violence which

14   has been alleged in the indictment, and that will be

15   litigated at sentencing.

16        THE COURT:  Right.

17        Do you understand that, Mr. Abdullah?

18        DEFENDANT ABDULLAH:  Yes, sir.

19        THE COURT:  Mr. Woodfolk?

20        MR. MCDOWELL:  If I could clarify that further,

21   sir?

22        THE COURT:  Sure.

23        MR. MCDOWELL:  My client, Mr. Woodfolk, is under

24   my instructions not to discuss with anyone, and that

25   includes at this point the United States probation

1    officer, any conduct other than that conduct with

2    respect to the drug activity.  I would ask that the

3    Court recognize that Mr. Woodfolk is under instructions

4    from his attorney, and that there would be no

5    repercussions because of that.

6         THE COURT:  If you all are in agreement with

7    this, regardless of what position the probation officer

8    would take, it would seem to me that is the only way to

9    leave open the possibility of litigating, of fairly

10   litigating these issues.  If for some reason I change

11   my mind, at the end of all of this I will give you your

12   right to withdraw your guilty plea.  As far as I am

13   concerned, that is necessary and appropriate at this

14   stage.  I would, unless the government sees some

15   reason, I certainly will honor your not talking to the

16   probation officer about that.  Frankly, that would not

17   be, frankly, consistent with the Fifth Amendment and

18   with the possibility of entering into an agreement at

19   this time.

20        MR. MCDOWELL:  Thank you.

21        THE COURT:  Now certain guideline factors,

22   essentially what you do is you agree to disagree about

23   them.  As we were just saying, actually there are

24   certain things that have to be litigated.  These

25   include, but are not limited to, we tried to, your

1    lawyers have tried to focus upon what may be in

2    dispute.

3        There may be other factors in dispute, but the

4    only thing there is an agreement about is the base

5    offense level, and actually, in both of your cases, a

6    three-level increase in the role of the offense and

7    then a three-level decrease for acceptance of

8    responsibility in the terms stated.

9        Everything else isn't in dispute, but these would

10   include whether or not during the course of the

11   conspiracy, firearms were brandished, if justice was

12   obstructed, death resulted from conduct, there was any

13   significant physical injury suffered by anyone, if

14   anyone who was killed or injured was subjected to

15   unlawful restraint, whether there was property damage

16   or loss and whether weapons were used.

17       It is agreed that within a week of today,

18   actually the day that the guilty plea is being entered,

19   that you will each, each of you, plus the government,

20   will submit to the probation officer a list of those

21   departures, adjustments or offense characteristics

22   which you will be seeking at sentencing.

23       I take it that, again, implicit in this, it may

24   be expressed somewhere, but both the government and you

25   are reserving your right to seek any adjustment or

1    departure also, and that that was something which would

2    be litigated at a later date, that both sides, either

3    side may move for any departure or adjustment that they

4    deem appropriate.

5          It is also agreed that there is no agreement as

6    to what your criminal history category is.  I am sure

7    your counsel explained to you that, in a way, the

8    guidelines work like a draft or like a grid.  One

9    column is the offense level.  We have been discussing

10   matters which might affect that, and the cross-section

11   or the intersection is by the criminal history

12   category, and it is where the grid intersects where the

13   sentencing guideline is, ends up being applicable.

14         I mention that because the way the guidelines

15   work, if you have a very severe criminal record in some

16   respects and basically a severe criminal record, that

17   could actually affect, not only the criminal history

18   category, that actually could affect the offense level

19   as well because that is the way it works.

20         As set forth in the letter, it is not really part

21   of the plea agreement, but I want to make sure you

22   understand, I am not bound by this plea agreement and

23   indeed, as I said before, I am duty bound to sentence

24   you according to the facts as I find them to be.

25         I am sure that it is here somewhere.  If it is

1      not, I want to make sure that it is a term of the

2      agreement.  Yes, it is here.  I missed paragraph five

3      in its entirety.

4          At sentencing the government reserves the right

5      to recommend any sentence that it deems appropriate in

6      the guideline range which I find to be appropriate.

7          The government also agrees that at the time of

8      sentencing, it will move to dismiss all counts in the

9      indictment against you, other than the count to which

10     you agree to plead guilty.  My understanding is that, I

11     am sure the intent of the agreement is it would be the

12     original indictment, plus any counts, other than Count

13     1, in the second superseding indictment.

14         MS. RINGLER:  That is correct.  There is also a

15     first superseding indictment.

16         THE COURT:  Also the first superseding

17     indictment.

18         MS. RINGLER:  That is correct.

19         THE COURT:  I will tell you that if I did not

20     grant that motion, I will give you the right to

21     withdraw your guilty plea.

22         Mr. Abdullah, that is my understanding of your

23     plea agreement.

24         Ms. Ringler, Mr. Kaminkow, is that your

25     understanding?  Have I forgotten to add anything, say

```
1    anything, or is that your understanding of the
2    agreement?
3         MR. KAMINKOW:  Your Honor, that is my
4    understanding.
5         MS. RINGLER:  I think that is a fair reading of
6    the plea agreement, Your Honor.
7         THE COURT:  Most importantly, Mr. Abdullah, is
8    that your understanding of the plea agreement?
9         DEFENDANT ABDULLAH:  Yes, sir.
10        THE COURT:  Have any other promises or
11   inducements been made to you, other than what I have
12   stated, to get you to enter this plea?
13        DEFENDANT ABDULLAH:  No, sir.
14        THE COURT:  Mr. Woodfolk, let me look over your
15   agreement.  I probably could have made this easier.
16   The agreements are exactly the same; is that right?
17        MS. RINGLER:  That is right, Your Honor.
18        THE COURT:  Mr. Woodfolk, is what I have said,
19   been telling Mr. Abdullah what I understand his plea
20   agreement to be also what you understand your plea
21   agreement to be?
22        DEFENDANT WOODFOLK:  Yes, sir.
23        THE COURT:  Have any other promises or
24   inducements been made to you to get you to enter the
25   plea?
```

1.      DEFENDANT WOODFOLK:  No.

2       THE COURT:  Mr. McDowell, have I stated what you

3  understand the plea agreement to be?

4       MR. MCDOWELL:  You have, sir.

5       THE COURT:  Now I do need to be satisfied that

6  there is a factual basis for your entry of the pleas.

7  If you all will be seated, I am going to ask Ms.

8  Ringler what the government would prove if the case

9  went to trial.

10      MS. RINGLER:  Your Honor, I --

11      THE COURT:  Ms. Ringler, I take it that -- I

12  don't know, it will help me to know how to assimilate

13  to begin with, have you written this to make it only

14  those facts which relate to the drug conduct or to the

15  other conduct as well?

16      MS. RINGLER:  That is correct, Your Honor.  The

17  statement of facts that I have just presented to the

18  Court, and copies of which were previously provided to

19  defense counsel, relate only to the narcotics activity,

20  the distribution of heroin, which the defendants have

21  agreed to by virtue of their guilty plea.

22      The only additional information included in the

23  statement of facts related to some items seized from

24  their homes at the time of their arrest, but beyond

25  that, we did not include any other facts that would be

1    in dispute at sentencing since we would present them at

2    that time.

3         THE COURT:  When we get to the firearms that were

4    seized, I take it that is not part of what is agreed

5    upon as the drug conduct?

6         MS. RINGLER:  The statement of facts relates to

7    what the defendants agree the government could present

8    and proved at sentencing, as opposed to their

9    stipulating that these are the facts.

10        THE COURT:  That the firearms aren't in any way

11   attributable to them or anything of that nature.

12        MS. RINGLER:  That is correct.

13        THE COURT:  I also noticed that -- we can get to

14   it when we get to it.  Isn't there some reference that

15   somebody had been convicted of something?

16        MS. RINGLER:  There is a reference to conviction

17   as it relates to the possession of the firearms.

18        THE COURT:  All right.  It would be a question of

19   whether or not, as to these defendants, that would be

20   admissible.  It might have to be admissible if there

21   was a joint trial.  We will reach that when we get to

22   it.  Go ahead.

23        MS. RINGLER:  Your Honor, the statement of facts

24   in summary provide that the parties stipulate and agree

25   if this case had proceeded to trial, the government

1      could have proven the following facts, those facts

2      being that between January of 1991 and January of 1994,

3      these defendants operated and controlled a heroin

4      organization in the metropolitan Baltimore area.  At

5      all times, this organization was controlled by Sahib or

6      Mr. Abdullah and Mr. Woodfolk, who were responsible for

7      all of the key decisions made for and on behalf of the

8      organization and its members.  These decisions included

9      procuring heroin for sale, the pricing and distribution

10     of the heroin, and the distribution of the financial

11     proceeds from the sales.

12          During the aforementioned period, these

13     defendants and their co-conspirators distributed in

14     excess of a kilogram of heroin, Schedule I narcotic

15     controlled substance.  The organization had various

16     names for their heroin product, which included Strong

17     as Steel, Python and Nice and Smooth.

18          For much of the period of time we are talking

19     about, the organization referred to itself as the

20     Strong as Steel organization.  As of 1992, the

21     government's evidence would show that this organization

22     began experiencing some financial problems due to

23     increased law enforcement presence focusing on their

24     activities.

25          During the conspiracy, this organization

1    distributed retail and wholesale amounts of heroin.

2    They used shops and stash houses for this purpose.  The

3    stash houses were located at various places, which

4    included 524 Gold Street, 546 Baker Street, 510 Baker

5    Street, 1938 West Lexington Street, as well as others.

6         In 1992, the organization began using the

7    residence of Doncarlos Williams, located at 2207 Eutaw

8    Street, and they used this residence to cut and package

9    their heroin and its subsequent distribution to various

10   shops for sale.  Different stash houses were often used

11   for day and night business, but at least one stash

12   house was opened for business seven days a week.

13        In early 1992, Mr. Abdullah and Mr. Woodfolk

14   opened the Sharper Edge Barber Shop at the Reisterstown

15   Road Plaza in Baltimore City.

16        During this conspiracy, the defendants controlled

17   and directed the activities of numerous members of the

18   organization, including Corey Johnson, Doncarlos

19   Williams, Harold Bruton and Timothy Shird.

20        Between 1991 and 1994, these defendants engaged

21   in the following acts all in furtherance of the

22   conspiracy.

23        Between 1991 and '92, Mr. Abdullah made numerous

24   trips to New York City to purchase heroin, which was

25   paid for with cash.  When he returned to Baltimore, Mr.

1    Abdullah would direct the cutting and packaging of the
2    heroin.  Both he and Corey Woodfolk would then direct
3    its delivery or deliver it to the organization's
4    numerous stash houses.  At the end of each business
5    day, one of the, one or both of the defendants would
6    pick up the cash from the stash house.

7         In February of 1992, Mr. Woodfolk and Mr.
8    Abdullah purchased and began operating the Sharper Edge
9    Barber Shop, and the evidence would show that both of
10   them brokered heroin deals through this location.

11        On December 15, 1992, Co-Conspirator, Doncarlos
12   Williams, and others possessed cocaine and heroin in
13   the 1500 block of Ellamont Street in Baltimore City,
14   Maryland.  This heroin had been supplied to Williams by
15   Mr. Abdullah.

16        During a search incident to Mr. Williams' arrest,
17   Mr. Williams was found to have in his possession 17
18   bags of heroin, a pager and $123.  Chemical analysis
19   was positive for both the presence of cocaine and
20   heroin from the narcotics seized from Mr. Williams.

21        The evidence would further show that in November
22   and December of 1992, Doncarlos Williams moved into an
23   apartment at 2207 Eutaw Place.  As previously stated,
24   this apartment was used to cut and package heroin, that
25   Co-Conspirator, Doncarlos Williams, was responsible for

1    weighing and cutting gram quantities of heroin,

2    bundling them up and passing them on to his

3    co-conspirators responsible for running the

4    organization's shops.  All of the heroin which passed

5    through Mr. Williams' residence was supplied to him

6    primarily by Mr. Abdullah and sometimes Mr. Woodfolk,

7    that the shops were located, as previously stated, at

8    Baker and Brunt Streets, north Avenue and Pulaski

9    Highway --

10         MR. KAMINKOW:  Pulaski Street.

11         MS. RINGLER:  Pulaski Street, excuse me, and

12    Hilton and Baker Streets.  When these shops ran out of

13    heroin, co-conspirators would call Mr. Williams, who

14    would supply them with additional heroin.  All of the

15    money at the end of each business day or evening was

16    returned to Mr. Williams and then turned over by him to

17    Mr. Abdullah or Mr. Woodfolk.  The receipts from

18    evening sales alone ranged between $2,000 and $7,000

19    per night.

20         On February 18, 1993, these defendants, along

21    with Mr. Williams, sold and distributed one-half ounce

22    of heroin for $3400 to undercover agents at Pargos

23    Restaurant in Baltimore County, Maryland.  That heroin

24    was found to be 79 percent pure.

25         On March 11, 1993, Mr. Abdullah, along with

1    Harold Bruton, distributed one ounce of heroin for

2    $6500.  This distribution occurred in the parking lot

3    of the Giant located at Menlo and Reisterstown Roads in

4    Baltimore, Maryland.  The sale of the heroin was

5    negotiated by Mr. Abdullah.  The actual distribution

6    occurred in his car, where he directed Mr. Bruton to

7    actually distribute the heroin.  Mr. Abdullah was then

8    paid in cash, and the purity of this heroin was found

9    to be 32 percent.  The car in which this transaction

10   occurred was registered to Mr. Abdullah, using his

11   father's address on Poe Avenue.

12        On March 11, 1993, Mr. Woodfolk sold one-half

13   ounce of heroin for $3500 outside of Dimitris

14   Restaurant located on Patterson Avenue in Baltimore.

15   Prior to his sale, the purchaser met with Mr. Woodfolk

16   at the Sharper Edge Barber Shop to discuss the

17   particulars of the transaction.  At that time the

18   purchaser was instructed by Mr. Woodfolk to meet him at

19   the location where the sale occurred.  The purity of

20   that heroin was 77 percent.

21        Another distribution occurred on March 17, 1993.

22   That one was by Mr. Abdullah, one-half ounce of heroin

23   for  $4,260.  That distribution by Mr. Abdullah, along

24   with Doncarlos Williams, occurred at the Kentucky Fried

25   Chicken Restaurant at Reisterstown Road.  Again, Mr.

1   Abdullah negotiated the sale, which occurred in his

2   white Acura Legend.  During that transaction Mr.

3   Abdullah told the purchaser that the heroin was all

4   rock, and its purity was later found to be 60 percent.

5          On March 19, 1993, Mr. Abdullah purchased 129

6   boxes of mannitol and four 500 gram bottles of inositol

7   powder.  These substances are used as cut and were

8   purchased by Mr. Abdullah to further the heroin

9   distribution activities.  He paid $160 for this cut,

10  and the transaction occurred in the Giant Supermarket

11  on North Ritchie Highway.

12         The evidence would further show that the money

13  that Mr. Abdullah used to purchase the cut was recorded

14  law enforcement money which had previously been given

15  to him during the aforementioned March 17th undercover

16  sale of heroin.

17         On April 7, 1993, Mr. Woodfolk sold one-half

18  ounce of heroin for $3400 in his black Nissan 240SX, as

19  it sat in the parking lot of the Sharper Edge Barber

20  Shop.  The purity of this heroin was 66 percent.  This

21  transaction was negotiated by Mr. Woodfolk through a

22  series of telephone calls from the Sharper Edge.

23         On May 13, 1993, Mr. Abdullah distributed

24  one-half ounce of heroin for $3500 in front of Metro

25  Brokers located at Baltimore and Eutaw Streets in

1    Baltimore.   The purity of that heroin was found to be

2    65 percent.

3         On May 25, 1993, a search warrant was executed at

4    Doncarlos Williams' residence, 2207 Eutaw Place, and

5    among the items recovered were a box of ammunition,

6    several bags of white powdery substance, later

7    confirmed to be cocaine, heroin and mannitol, a

8    magazine to a semiautomatic weapon, a beeper, a

9    walkie-talkie, and other items.

10        On January 10, 1994 --

11        THE COURT:   In my original statement there is

12   something referred to as stereo and VCR tape deck from

13   the BG&E burglary.   I take it that should not be deemed

14   as part of this statement of facts for purposes of

15   sentencing.

16        MS. RINGLER:   Yes, it should, Your Honor.   I just

17   said other items, but both sides have seen this, as

18   well as the Court, so I would add that.

19        THE COURT:   Again, I don't want to be difficult

20   about this, but in light of the limited nature of what

21   is being agreed to, unless I am asleep at the switch,

22   this refers to BG&E burglary as though I know what it

23   is from the previous statement of facts.   I don't think

24   it has been previously mentioned, and it doesn't seem

25   to me that the BG&E burglary is what I would understand

1    "drug activity" to be.

2        So I would think an easy answer would be that I

3    not -- you can say what you can prove.  Number one, I

4    don't know what you are talking about from what you

5    have said so far, unless I missed it.  In any event, I

6    don't think I ought to be asking them if they admit to

7    these facts.

8        MS. RINGLER:  That is fine.  As to that burglary,

9    the government would present evidence to that at

10   sentencing.

11       THE COURT:  Again, I don't want to be difficult.

12   This is an important matter.  I want to make sure that

13   we are all on the same wavelength.

14       MS. RINGLER:  That is fine, Your Honor.  The

15   evidence would further show that when Mr. Abdullah was

16   arrested in his home on January 10, 1994, he had

17   previously been convicted of burglary, as set forth in

18   the statement of facts.  That burglary conviction was

19   on June 1, 1987, in Maryland state court.  As such, he

20   was prohibited from owning or possessing a firearm.  At

21   the time of his arrest, Mr. Abdullah had within his

22   possession and control a .380 semiautomatic Davis

23   Industries Model P-380 pistol, Serial Number AP265938.

24   Said firearm was in and affecting commerce, having been

25   manufactured outside of the state of Maryland.

36

1           Similarly, the evidence would show that Mr.
2      Woodfolk was arrested at his home on the same date,
3      that being January 10, 1994.  Also found within his
4      possession and control, specifically located on a brass
5      rail around his headboard, and within his reach, was a
6      loaded .357 Magnum, Ruger Security Six Revolver, Serial
7      Number 154-O4372.

8           Mr. Woodfolk had also been previously convicted
9      in Maryland state court of distribution of cocaine on
10     March 14, 1987, and as such, was prohibited from
11     possessing a firearm.  The firearm was in and affecting
12     commerce, having been manufactured outside of
13     Maryland.

14          Also seized from his apartment were a number of
15     items which the government will present at sentencing,
16     if the Court would rather not consider these facts at
17     this time, those items being a bulletproof vest, and in
18     a closet a bag containing duct tape, ammunition, gloves
19     handcuffs, a lock-blade knife, and a black aeroskin
20     hood.

21          This statement of facts further provides that
22     this is a summary of the defendants' narcotics
23     activities and that evidence of other relevant conduct,
24     including violence committed by them and their
25     co-conspirators, which is disputed by the defendants,

1   will be later presented at sentencing.

2          THE COURT:  Okay.  All right.  Will everybody

3   stand up on the defense side?  Mr. Abdullah, Mr.

4   Woodfolk, do you admit that the government could prove

5   these facts at trial?

6          MR. KAMINKOW:  Your Honor, on behalf of Mr.

7   Abdullah, we understand this is what the government's

8   proof would be.  We do not admit that he possessed on

9   January 10, 1994.

10         THE COURT:  I agree.  That ought to be carved

11  out.  That is why I was going to phrase this

12  differently.

13         MR. KAMINKOW:  It was certainly present on the

14  premises occupied by he and his wife at the time that

15  the search and seizure warrant was executed.  However,

16  we do not admit that he in fact did possess that

17  weapon.

18         THE COURT:  That he was in possession of it.

19         MR. KAMINKOW:  That is correct.

20         THE COURT:  Do you all admit, however, that the

21  facts, as stated by Ms. Ringler, the government could

22  prove if the case went to trial?

23         DEFENDANT ABDULLAH:  Yes, sir.

24         DEFENDANT WOODFOLK:  Yes.

25         MR. MCDOWELL:  On behalf --

```
 1              THE COURT:  The same thing about the gun on your
 2       side?
 3              MR. MCDOWELL:  Yes, sir, and in addition, I
 4       believe that there is a disparity here.  There is no
 5       agreement in the plea agreement as to his criminal
 6       history.  Specifically page seven, Roman Numeral 10,
 7       where Mr. Woodfolk is said to have been convicted of
 8       distribution of cocaine, I believe that that was a
 9       possession count and not a distribution count.
10              THE COURT:  All right.  So that is a factor in
11       dispute, but other than that --
12              MR. MCDOWELL:  It is according to the plea
13       agreement.
14              THE COURT:  That is a fact in dispute.  In any
15       event, subject to that -- and you are even questioning
16       whether the government could prove the distribution
17       count at trial, I gather?
18              MR. MCDOWELL:  Yes, sir.
19             (THE COURT:  Subject to that, I understand that
20       you agree this is what the government would prove if
21       the case went to trial?)
22              MR. MCDOWELL:  Yes, sir.
23              THE COURT:  Mr. Woodfolk, you said yes before?
24              DEFENDANT WOODFOLK:  Yes, Your Honor.
25              THE COURT:  Let me ask you a slightly different
```

1    question.  Any questions?

2          MR. MCDOWELL:  Excuse me, Your Honor.

3          THE COURT:  No problem.  Do you have a question?

4    If you want to ask your counsel first, that is fine.

5          DEFENDANT ABDULLAH:  No, sir.

6          THE COURT:  Now a slightly different question,

7    with the exception of these facts that we talked about,

8    which the firearms, I understand that you all do not,

9    each of you do not admit possession of firearms, that

10   is not part of my question, I am also asking, in

11   addition to what I asked you about whether the

12   government could prove this, with the exception of the

13   firearms, did you also do the things that the

14   government said it could prove that you did?

15         DEFENDANT ABDULLAH:  The majority of them I knew

16   about, Your Honor.  Some of them I admit I am not

17   guilty, some of them I --

18         DEFENDANT WOODFOLK:  Some of them are outright

19   lies.

20         MR. KAMINKOW:  I will ask the question this way

21   without characterizing it as a lie.  The government

22   claims that they have evidence to indicate that Mr.

23   Abdullah went to New York to obtain heroin.  Mr.

24   Abdullah has told me, and is prepared to tell the

25   Court, that he never went to New York to obtain

1   heroin.  He did obtain heroin.

2          THE COURT:  Let me ask this once again.

3          MR. KAMINKOW:  He did obtain heroin and he

4   obtained heroin on several occasions, but not from New

5   York.

6          DEFENDANT ABDULLAH:  So it really doesn't make a

7   difference if it came from --

8          THE COURT:  You are right about that.  If there

9   is anything wrong, but the critical question is, and I

10  want, I honestly want to know from you, not only if you

11  agree --

12         DEFENDANT ABDULLAH:  I believe the government can

13  prove anything they want to, Your Honor.

14         THE COURT:  I'm sorry.

15         DEFENDANT ABDULLAH:  I believe the government can

16  prove what is in that indictment.

17         THE COURT:  Do you, do each of you also admit,

18  without getting into details of everything, do you

19  admit that you essentially participated in a

20  conspiracy --

21         DEFENDANT ABDULLAH:  Yes, sir.

22         THE COURT:  -- in an agreement with others to

23  distribute, if you didn't do it yourself, where you

24  knew that a kilogram or more of heroin was being

25  distributed?

```
 1            DEFENDANT ABDULLAH:  Yes, sir.
 2            DEFENDANT WOODFOLK:  Yes, Your Honor.
 3            THE COURT:  Okay.  I find that you are competent
 4   to enter the plea, that you understand the charges
 5   against you and the penalties to which you are subject,
 6   that you understand the rights that you are pleading,
 7   excuse me, that you giving up by pleading guilty, that
 8   you are entering a plea voluntarily, and that there is
 9   a factual basis for your entry of the plea, the
10   government's proof would establish your guilt beyond a
11   reasonable doubt, what you just candidly told me, you
12   are, in fact, guilty of the events you are pleading
13   guilty to.
14            Before I decide whether or not to accept your
15   guilty pleas, Ms. Ringler, or defense counsel, do you
16   know of anything else I should take up with either
17   defendant?
18            MS. RINGLER:  No, Your Honor.
19            MR. KAMINKOW:  No, sir.
20            MR. MCDOWELL:  No, sir.
21            THE COURT:  I will accept your pleas of guilty as
22   to Count 1 of the second superseding information.
23            Now we ought to set a sentencing date.  How long
24   for presentence reports?
25            THE CLERK:  After 11/23.
```

1          THE COURT:  After 11/20.  So obviously --

2          MR. KAMINKOW:  Your Honor, it seems to me that

3     one of the problems we have at the moment is without

4     the government advising us which enhancements they seek

5     and which overt act they intend to prove, it is

6     difficult to gauge how long we are going to need.  My

7     guess is we are going to need anywhere from a week to

8     week and a half for the sentencing hearing.

9          MS. RINGLER:  I think that is fair, Your Honor.

10          THE COURT:  Let me ask you all this because what

11     I was going to do was try to find that week or so after

12     the presentence report had been prepared.

13          I, frankly, see no point in the probation officer

14     making proposed findings on the disputed issues.  If

15     you want to, that is fine with me.  I am not saying we

16     can't have it.  I, frankly, don't know what point that

17     would serve.  It seems to me that the agreement is that

18     that is something I am going to have to resolve after

19     hearing the evidence.

20          What I would propose is that we instruct the

21     probation officer not to -- to list the factors that

22     are in dispute.  Frankly, there are going to be so many

23     that I think it would be silly to have hypotheticals as

24     to what the guideline range would be until after I've

25     made the determination, but basically for them to do a

43

1    report containing the information other than the

2    disputed items, and then really not even doing the

3    disputed factors, doing a criminal history

4    investigation, and then leaving it up to us to do the

5    rest by process of litigation.  Does that make sense?

6          MR. KAMINKOW:  Absolutely.

7          MS. RINGLER:  I think it would be impossible for

8    them to do it actually.

9          THE COURT:  With that in mind, we talked the

10   other day, when we thought this might be happening,

11   that we would have to wait until after the presentence

12   reports had been prepared.  I am not sure that there is

13   any reason for that.  I think that if you, if people

14   have put times off on their calendars, subject to

15   whether the case is still going to be going to trial --

16         MS. RINGLER:  It looks like it is, Your Honor.

17         THE COURT:  It does?

18         MS. RINGLER:  Yes, sir.  One thing we had

19   discussed is perhaps coming up with some mechanism by

20   which we can facilitate the sentencing, by virtue of

21   the fact that it looks like we are already going to

22   have a trial going on, where a lot of the same evidence

23   is going to be presented.  That is something that we

24   will have to discuss with defense counsel, if we can

25   come up with some --

44

1          THE COURT:  I would love to do it.  It would have

2     to be awfully imaginative because I take it you will

3     have one defendant here on trial before the jury.  It

4     would be wonderful to have other people here to

5     cross-examine.

6          MS. RINGLER:  I know one method that has been

7     used in at least one other case was where if the same

8     witnesses were going to testify at trial and at

9     sentencing, defense counsel would be provided

10    transcripts of their trial testimony.  The government

11    would recall them at sentencing for purposes of

12    cross-examination.  Since the Court had already heard

13    their entire direct examination, thereby the defendant

14    would have the opportunity to cross-examine them about

15    any statements that they had made, but it would not

16    force the Court to hear the entire direct examination

17    over again.  We would also advise defense counsel when

18    these witnesses were going to testify in the event that

19    they want to be here.

20          THE COURT:  You are not going to have daily

21    transcripts?

22          MS. RINGLER:  No, Your Honor, but I think there

23    would be a lapses of time between the --

24          THE COURT:  You are not talking about much.

25          MS. RINGLER:  It is not that many witnesses, Your

```
1    Honor.  It might be four or five witnesses.

2         MR. KAMINKOW:  Your Honor, my client objects to

3    that procedure because he feels he should have the

4    right to face his accusers.

5         MS. RINGLER:  They will be here.  They just

6    wouldn't go through their entire direct examination,

7    unless there was some additional questions that they

8    hadn't been asked.

9         THE COURT:  But they are not there before this

10   defendant.  He thinks it is important for them to hear

11   the direct?

12        MR. KAMINKOW:  Am I correct?

13        DEFENDANT ABDULLAH:  Yes, sir.

14        THE COURT:  I think that is fair.  Analytically

15   or not, I think that is part of what it is all about.

16   That is precisely what confrontation is all about.  If

17   that is what he wants, that is what he is entitled to

18   have.

19        MS. RINGLER:  Just so it is clear, we would have

20   the person here.

21        THE COURT:  I understand.  If you've got to give

22   direct testimony, you have to face somebody and give

23   it.

24        MS. RINGLER:  That is fine, Your Honor.  I just

25   threw that out.
```

1    THE COURT: You know me, I am the person who most

2    wants to be efficient. I think that is what the

3    confrontation clause probably is all about.

4    Okay. Well, why don't we try to set a week to a

5    week and a half.

6    What I am trying to do, I don't know if it

7    matters, is to accommodate your trial calendars by

8    putting it some time within the time you probably set

9    aside for the trial. You still think the trial is

10    going to be shorter, don't you?

11    MS. RINGLER: Yes, Your Honor.

12    THE COURT: So if we are going to begin it, it

13    looks like October 3rd, would it make sense to try to

14    set the sentencing in this case to begin here, to begin

15    November 7th to the 14th?

16    MS. RINGLER: You could do it November 7th or

17    probably the week before that as well, if the Court was

18    available. I think the trial --

19    THE COURT: Except, don't forget, I am going to

20    be missing a week of trial essentially. It is going to

21    be one of those weeks where we only have one day of

22    trial.

23    MS. RINGLER: I think the trial with Mr. Johnson

24    will probably take ten days maybe, two weeks.

25    THE COURT: Why don't we try to set this for the

1    week of November 7th.

2             MS. RINGLER:  That is fine.

3             THE COURT:  Are you all available?  Because I

4    think that was probably what we estimated for this

5    trial anyway.

6             MR. KAMINKOW:  I don't have my trial calendar

7    here, Your Honor.  You know, we can try to work it in.

8    I will check when I get back to the office.

9             MR. MCDOWELL:  Would the Court guarantee that we

10   would be finished by November 17?

11            THE COURT:  Are you going away?

12            MR. MCDOWELL:  Yes, sir, on the 18th.

13            THE COURT:  For how long?

14            MR. MCDOWELL:  Ten days.

15            THE COURT:  I will guarantee you if we are not

16   finished, you can go away.

17            MR. MCDOWELL:  Thank you, sir.

18            THE COURT:  We will finish up when you get back.

19            MR. MCDOWELL:  Thank you.

20            THE COURT:  I can't guarantee it because I don't

21   know the scope of it.  It sounds to me like there is no

22   reason it can't be.

23            I am going to put this in as though it was a

24   trial and not just a sentencing.  Then in the meantime,

25   we will tell the probation officer to go ahead with

1      preparation of the presentence reports.  Basically it

2      is an old-style presentence report, with the basic

3      background information and about criminal history.

4      They do not have to get involved in this.

5          Subject to hearing from Mr. Kaminkow, just so you

6      all know, I set it in for the 7th, and we will go

7      through the 17th?  Yeah.  I will be unavailable -- that

8      Friday is a holiday, and I've got a conference I've got

9      to go to Monday and Tuesday.  That sounds like it ought

10     to be perfect.  We will be finished by the 17th.  So it

11     will be the week of the 7th to the 14th.  So you all

12     can plan your calendars, if you have clients or short

13     trials, I will be unavailable the 14th and 15th of

14     November.

15          Anything further?

16          MS. RINGLER:  Not from the government, Your

17     Honor.

18          MR. KAMINKOW:  No, Your Honor.

19          THE COURT:  Let me ask you all, because it is

20     obviously an important matter, Mr. Abdullah, Mr.

21     Woodfolk --

22          DEFENDANT ABDULLAH:  My schedule is open.

23          (Laughter.)

24          MR. KAMINKOW:  He said his schedule is open.

25          THE COURT:  Any question you have about what went

1   on here today?  Are you all content to enter your

2   guilty plea?

3          DEFENDANT ABDULLAH:  No, sir.

4          THE COURT:  You have no questions?  You are

5   content to enter your guilty pleas?

6          DEFENDANT ABDULLAH:  Yes, sir, except the

7   violence thing.

8          DEFENDANT WOODFOLK:  Yes.  May I ask you a

9   question, Your Honor?

10         THE COURT:  Yes.

11         DEFENDANT WOODFOLK:  During the course of this

12  sentence hearing, will we be able to talk to you

13  freely?

14         THE COURT:  Through your counsel, and you

15  certainly can, and before I sentence you, you will be

16  able to say anything you want on your own.

17         DEFENDANT WOODFOLK:  Thank you, Your Honor.

18         THE COURT:  Thank you all.

19         (The proceedings concluded.)

20

21

22

23

24

25



```
   OTVH3            *          INMATE EDUCATION DATA        *      06-01-2015
PAGE 001 OF 001 *                  TRANSCRIPT              *      11:08:02


REGISTER NO: 30079-037    NAME..: WOODFOLK            FUNC: PRT
FORMAT.....: TRANSCRIPT    RSP OF: OTV-OTISVILLE FCI

--------------------------- EDUCATION INFORMATION ---------------------------
FACL ASSIGNMENT DESCRIPTION              START DATE/TIME STOP DATE/TIME
OTV  ESL HAS    ENGLISH PROFICIENT       01-05-1995 1542 CURRENT
OTV  GED HAS    COMPLETED GED OR HS DIPLOMA 01-10-1995 1340 CURRENT


--------------------------- EDUCATION COURSES ---------------------------
SUB-FACL   DESCRIPTION              START DATE  STOP DATE EVNT AC LV  HRS
OTV GP     FORK LIFT TRAINING CLASS  01-10-2014 CURRENT
OTV GP    ✓CARTOONING                09-08-2013 11-24-2013  P   C  P.   1
OTV GP     NFPT NUTRITION CLASS      12-28-2010 02-12-2011  P   W  I    1
OTV GP     FOOD PREPARATION          04-18-2010 10-18-2010  P   C  P  120
OTV GP     REAL ESTATE MORTGAGE BROKER 09-21-2010 09-21-2010 P  C  P   30
OTV GP     RESIDENTIAL WIRING        04-28-2010 07-02-2010  P   C  P  120
OTV GP     MONEY MATTERS: THURS 1-3  09-21-2010 10-21-2010  P   C  P   20
OTV GP    ✓CORE PERFORMANCE          09-23-2008 09-26-2010  P   C  P   10
OTV GP     PREP FOR CDL WRITTEN EXAM 08-02-2010 09-02-2010  P   C  P   30
OTV GP     EDUCATION ORIENTATION - AM 02-26-2008 02-26-2008 P  C  P    3
FAI       ✓PORTABLE TYPEWRITER       05-27-2006 06-24-2006  P   C  P    1
FAI       ⌣SWINTEC TYPING CLASS      06-07-2006 06-14-2006  P   C  P    1
FAI       ✓S.AFRICAN EXPERIENCE      03-20-2006 03-20-2006  P   C  P    2
FAI       ⌣ACE-CHESS VIDEO SERIES    10-04-2005 10-18-2005  P   C  P    4
LEW       ✓CIVIC STUDIES ACE CLASS   02-11-2002 05-20-2002  P   C  P   36
LEW       ✓RPP-PERSONAL GROWTH       01-04-2002 03-29-2002  P   C  P    2
LEW       ✓LEISURE ACTIVITY/FOOTBALL 09-12-1998 11-26-1998  P   C  P   33
LEW       ✓BASKETBALL OFFICIAL       01-13-1998 01-13-1998  P   C  P    4
LEW       ⌣PARENTING CLASS           06-20-1995 06-28-1995  P   W  V   10






G0000      TRANSACTION SUCCESSFULLY COMPLETED
```






# Certificate of Achievement

### This certifies that

COREY WOODFOLK

*30079-037*

## has satisfactorily completed

THE TRANSCENDING ADDICTION COURSE

### Consisting of ___17___ Hours of Training

### This certificate is hereby issued this ___14th___ day of ___Dec.___, 19 98

_____
R. Whitmire, ACSW, NCAC I

_____
C. Middleton, Ph.D., M.S.



30079-037






# Certificate of Achievement

### This certifies that

Corey Woodfolk # 30079-037

### has satisfactorily completed

*"A Framework For Recovery"*

Consisting of ___12___ Hours of Training

This certificate is hereby issued this ___07__ day of __DEC.__ , 19 98

_Wesley R. Schrader_
Wesley R. Schrader
Unit 3 Counselor

_A. W. Alexander_
A. W. Alexander
Unit 3 Unit Manager





# Certificate of Completion

*Presented To*

*Corey Woodfolk*

*For serving as **Instructor** of **Phase** I of Young Men Incorporated (**Leadership Training Academy**) at the Federal Correctional Facility Otisville, in Otisville, New York. The participants successfully completed the twenty hours of intensive programming and because of your efforts have met all the course requirements. On behalf of the Community Economic Development and Young Men Incorporated, this certificate is proudly given with the highest regards on this 22nd day of February, 2011.*

## Leadership Training Academy (Phase-I)



Al Welch
**Unit Manager-Program Coordinator**
**Community Economic Development**

A. Dachisen
*Associate Warden – Programs*
*Federal Bureau of Prisons*



# Certificate of Completion

*Presented To*

# Corey Woodfolk

30079-037



*This is to certify the above named individual has successfully completed the*

**Victim Impact Class**

*at the*

*Federal Correctional Facility Otisville, in Otisville, New York.*

*on this 17th day of May, 2012*



E. M. Darious
**Drug Treatment Specialist**
**Staff Sponsor**

J. Bowe
**Staff Psychologist**
**Staff Sponsor**

C. Flowers
**Unit Manager**
**Staff Sponsor**

A. McDonald
**Religious Services Assistant**
**Staff Sponsor**



# Certificate of Completion

**Presented To**

# Corey Woodfolk

## *Anger Management*

*This is to certify the above mentioned has completed six hours of **Anger Management** at the Federal Correctional Facility in Otisville, New York - **April, 2013**.*



_____
Dr. Bowe
*Program Coordinator*

_____
C. Cole - El
*Mentor/Instructor*



# Certificate of Completion

for the Path To Achieve Self-Development Program (PASD)



**COREY WOODFOLK**

In recognition of his participation in the Path To Achieve Self-Development (PASD) program here at FCI Otisville, he is presented with this certificate of completion.

This certificate is hereby issued this 17th day of April, 2008.

_____

E. M. Dariotis, Drug Treatment Specialist





# CERTIFICATE OF ACHEIVEMENT

### Presented to:

*Cory Woodfolk*

## For his Participation and Achievement in Completing the 120 hour Course:

# Modern Residential Wiring

**Presented this 12th Day of September, 2010**

*E. Aleszka*

**E. Aleszka, Program Coordinator**



# Certificate of Achievement

## Presented To:

*Cory Woodfolk*

### For his Participation and Completion of a 30 hour Course in:

# Commercial Drivers License

## Presented this 21st Day of July, 2010

E. Aleszka

_____

*E, Aleszka/Education Specialist*





# Certificate of Achievement

## Presented to:

Corey Woodfolk

## For his Participation and Achievement in Completing the 20 hour Course:

# MONEY MATTERS

Presented this 21th day of October 2010

*C. Aleszka*

_____

**Ms. Aleszka Program Coordinator**







# Certificate of Achievement

## Presented to:

Cory Woodfolk

## For his Participation and Achievement in Completing the 40 hour Course:

# MORTGAGE BROKER

AWARDED THIS 30th DAY OF NOVEMBER 2010

*C. Aleszka*

---

*Ms. Aleszka Program Coordinator*





# CERTIFICATE OF ACHEIVEMENT

## Presented to:

CORY WOODFOLK

## For his Participation and Achievement in Completing the 120 hour Course:

# FOOD PREPARATION

AWARDED THIS 19th DAY OF OCTOBER, 2010

*E. Aleszka*

———————————————————

**E. Aleszka, Program Coordinator**





# Certificate of Achievement

### Awarded To:

## *C. Woodfolk*

## *Advanced Sports Nutrition Trainers Course #2*

Date  01 March  2010

E. Du Plessis, Recreation Specialist



# Certificate of Completion

## Presented To

## Corey Woodfolk

## FORKLIFT OPERATOR TRAINING

*This is to certify the above mentioned has completed Forklift Operator Training at the Federal Correctional Institution, 2 Mile Drive, Otisville, New York 10963*
*June 26, 2014*

Louis Byer
**Staff Coordinator**



J. B. Ray
*Instructor*



*FCI Otisville, New York 10963*

## Fork Lift License

Issued to: Corey Woodfolk
Instructor: Louis Byer
Date Issued: 06-26-2014





# Blackstone Career Institute

*Est. 1890*

## Awards this Certificate in

## Paralegal Studies

### with Distinction upon

# Corey L. Woodfolk

*who has fulfilled all the requirements prescribed by the School and is entitled*

*to all of the honors, rights and privileges thereunto appertaining.*

In Testimony Whereof *this recognition of achievement is*

### Given this 18th day of February 2015

_____
President

*Valerie L. Behnke* B.S., M.Ed.
Director of Education



# BLACKSTONE CAREER INSTITUTE

1011 BROOKSIDE ROAD, SUITE 300, P.O. BOX 3717, ALLENTOWN, PA 18106-3717

## Student Transcript

## 31 Lesson Paralegal Studies Certificate Program

### 915 Clock Hours

**Student:** Corey Woodfolk 30079037
**Address:** FCI Otisville
PO Box 1000
Otisville NY 10963

**Student Number:** 08030287

**Enrollment Date:** 04/14/2014

**Completion Date:** 02/18/2015

| Text/Subject | Date Completed | Grade | Text/Subject | Date Completed | Grade |
|---|---|---|---|---|---|
| **Lesson: 1** | | | **Lesson: 7** | | |
| • Introduction To Law | 04/25/2014 | 100 | • Trusts | 01/05/2015 | 100 |
| • Contracts Part I | 04/25/2014 | 100 | **Lesson: 8** | | |
| • Contracts Part II | 04/25/2014 | 100 | • Law of Private Corporations | 01/06/2015 | 100 |
| • Contracts Part III | 04/28/2014 | 100 | • Law of Partnerships Part I | 01/12/2015 | 100 |
| **Lesson: 2** | | | • Law of Partnerships Part II | 01/13/2015 | 100 |
| • Law of Torts Part I | 06/13/2014 | 100 | **Lesson: 9** | | |
| • Law of Torts Part II | 06/13/2014 | 95 | • Constitutional Law Part I | 02/12/2015 | 100 |
| • Law of Torts Part III | 06/13/2014 | 100 | • Constitutional Law Part II | 02/12/2015 | 100 |
| • Law of Torts Part IV | 06/13/2014 | 100 | **Lesson: 10** | | |
| **Lesson: 3** | | | • Constitutional Law Part III | 02/12/2015 | 100 |
| • Criminal Law Part I | 07/14/2014 | 100 | **Lesson: 11** | | |
| • Criminal Law Part II | 07/15/2014 | 100 | • Legal Research Part I | 02/12/2015 | 95 |
| **Lesson: 4** | | | **Lesson: 12** | | |
| • Real Property Part I | 09/11/2014 | 100 | • Legal Research Part II | 02/17/2015 | 100 |
| • Real Property Part II | 09/11/2014 | 100 | **Lesson: 13** | | |
| **Lesson: 5** | | | • Employability Skills | 02/17/2015 | 100 |
| • Real Property Part III | 10/06/2014 | 100 | **Lesson: 14** | | |
| • Real Property Part IV | 10/06/2014 | 100 | • Ethics | 02/17/2015 | 100 |
| **Lesson: 6** | | | | | |
| • Pleadings in Civil Action Part I | 11/24/2014 | 100 | | | |
| • Pleadings in Civil Action Part II | 11/24/2014 | 100 | | | |
| • Practice in Civil Actions | 11/24/2014 | 100 | | | |
| • Criminal Procedure | 12/01/2014 | 95 | | | |
| **Lesson: 7** | | | | | |
| • Wills Part I | 12/23/2014 | 100 | | | |
| • Wills Part II | 01/02/2015 | 100 | | | |

**Student Average:** 99.51%    **\*\* FINAL \*\***

**This Document Issued:** 02/18/2015

**Blackstone Career Institute**

By: _Valerie L. Behrle B.S., M.Ed._
Registrar



Phone: 610-871-0031 • 800-826-9228 • Fax: 610-871-0034



**BLACKSTONE CAREER INSTITUTE**
1011 Brookside Rd, Suite 300
Allentown, PA 18106
610-871-0031   FAX: 610-871-0034
www.blackstone.edu

## HISTORY

If you search back issues of the World Book Encyclopedia you will find Blackstone listed as one of the oldest correspondence schools in the nation, founded in 1890 as the Blackstone School of Law in Chicago. In the early 1900s, the Modern American Law Series was developed for the program and was enthusiastically received by the legal community and laymen alike as a simple yet authoritative commentary on the law. In the late 1970s, Blackstone became a legal assistant/paralegal school and moved to Dallas, Texas. Additional study units on legal research, ethics, and employment skills were added so that graduating students could sit for the Certified Legal Assistant (CLA) exam.

In 2001, Direct Learning Systems Inc., an online publishing company, purchased the Blackstone legal assistant/paralegal school from the retiring owner and relocated to Pennsylvania. Shortly after, the name was changed to Blackstone Career Institute (BCI), currently offering distance education programs in a variety of career fields in addition to continuing legal education courses.

## ACADEMIC CALENDAR

With our daily admissions, students can enroll at any time and start their studies immediately.

## ACCREDITATION

Blackstone Career Institute is an accredited online school, accredited by the Accrediting Commission of the Distance Education and Training Council (DETC), Washington, D.C., regionally accredited by the Middle States Commission on Secondary Schools and is a private licensed school regulated by the Pennsylvania State Board of Private Licensed Schools.

## GRADING SYSTEM

| Letter Grade | Numerical Equivalent |
| --- | --- |
| A | 94-100 |
| B | 86-93 |
| C | 78-85 |
| D | 70-77 |
| F | Below 70 |

Any student who attains a final average of 94-100% at the end of their career training program will qualify as graduating "with Distinction." The certificate issued upon graduation will note this honor.

## MISSION STATEMENT

"A pioneer in distance education, Blackstone Career Institute has been meeting the needs of adult learners since 1890. The school's mission is to change people's lives through education, teaching them new skills and preparing them for entry-level careers in today's high demand fields. Blackstone offers adult learners convenient and affordable training that accommodates their busy schedules while helping them successfully meet their educational goals. As a nationally and regionally accredited school, we fulfill our mission by providing high-quality, effective, technology-driven distance education programs and services."

## RELEASE OF INFORMATION

In compliance with the Family Educational Rights and Privacy Act of 1974, this information is transferred at the request of the student. The recipient will not permit any other party access to the information without written consent of the student.

**AUTHENTICITY:** This Transcript contains an indelible Water Mark Logo. It is transparent and visible from both sides. Hold up to light to verify. Attempts to copy this document will result in the word "VOID" appearing on the copy.



# If not you... then who?
## If not now... then when?



# URBAN

## AKBAR PRAY FOUNDATION FOR CHANGE



**Know Your Rights:**
**What To Do If**
**You're Stopped By**
**Police, Immigration**
**Agents or the FBI**

**The 7 Laws of Money**

**Back to Ferguson and Beyond**

**Not My Child Syndrome**

ISSUE 20          November 2014

# Contents

### THE
### URBAN
### PERSPECTIVE

**AKBAR PRAY FOUNDATION FOR CHANGE**



*Cover Photo by
Crystal A. Castro*

| | |
|---|---|
| 4 | Mission Statement |
| 5 | Akbar Pray: Back to Ferguson and Beyond |
| 6 | Milagros Milan Harris:  Freedom of Choice: Fact or Fiction? |
| 7 | Dr. Ru:  The Death of the Game Revisited |
| 8 | Virgilio Llano: The Effects of World Religion…Part2 |
| 9 | Marvin Ellison:  Not My Child Syndrome |
| 10 | Guy Fisher: Will the U.S. lead the World is Incarceration or Education? |
| 12 | Elizabeth McBride:  Think Like a Rich Person |
| 13 | Nicole Kenney: Know Your Worth:  If we don't know, we can't grow our community |
| 14 | Sir Ken Robinson:  How to Escape Education's Death Valley |
| 16 | NPR:  One Lawyer's Fight for Young Blacks and 'Just Mercy' |
| 18 | ProPublica:  Deadly Force in Black and White |
| 20 | ACLU: Know Your Rights: What To Do If You're Stopped By Police, Immigration Agents or the FBI |
| 22 | Nathaniel Brooks:  After 23 Year Struggle a Conviction is Reversed |
| 23 | NYT:  Nursing Homes Behind Bars |
| 24 | Nicole Flatow:  Why the Midterm Election Was Huge for Criminal Justice System |
| 25 | Semaj Thomas:  Words by Saint |
| 26 | Omifalade: Life With Children |
| 27 | Sharmon A. Howell:  The 7 Laws of Money |
| 28 | Paul Bucheit:  Why We Should be Seething with Anger Over Inequality |
| 29 | Cory L. Woodfolk:  You and the Law |
| 30 | Behind the Wall |
| 31 | Matt O'Brian:  Poor Kids who do everything right don't do better than rich kids who do everything wrong |
| 32 | Dan Pacholke:  How Prison Can Help Inmates Live Meaningful Lives |
| 34 | Kenneth Chang:  Body's Blood Sugar Controls |
| 35 | Fidel: Prince Diary: The Art of Winning |
| 36 | The Urban Perspective: Poetry Showcase |
| 38: | Akbar Pray's Reading List |
| 39 | Jazz Hayden: Disarm the Police |

With the enactment of the Anti-terrorism and Effective Death Penalty act of 1996 (AEDPA), 110 Stat. 1214, the right of habeas corpus litigants to appeal adverse collateral rulings became significantly curtailed. The Certificate of Appealability or COA, as it is called, requires that an applicant make a "substantial showing of the denial of a constitutional right." 28 U.S.C. 2253(c)(2), by demonstrating that reasonable jurists could debate (or, for that matter, agree) that the petition "should have been resolved in a different manner." Slack v. McDaniel, 529 U.S. 473, 484 (2000). This threshold inquiry, however, does not require a full consideration of the factual or legal basis of the claim. In fact, the "statute forbids it." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). Moreover, it is entirely consistent with section 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. Id. at 337. Thus, the "question is the debatability of the underlying constitutional claim, not the resolution of that debate." Id. at 342. Cf. Tennard v. Dretke, 542 U.S. 274, 276 & 282-83 (2004).

Prior to section 2253's enactment, however, the "statute did not articulate a standard" for obtaining a certificate of probable cause (as it was then called) to appeal. 2 Randy Hertz and James S. Liebman, Federal Habeas Corpus Practice and Procedure, 6th ed. section 35.4[b][i] (2013)(Hertz & Liebman). All that was required was for an applicant to make a "substantial showing of the denial of [a] federal right." Barefoot v. Estelle, 463 U.S. 880, 893 (1983), superseded by statute, 110 Stat. 1214, as recognized in Slack, 529 U.S. at 483-84. There was no concomitant obligation, as is under section 2253(c), to specify each claim that meets the "substantial showing" requirement. See 2 Hertz & Liebman, section 35.4[b][i]. Indeed, a district court could make the substantial showing assessment based upon the habeas petition as a whole. See, e.g., U.S. v. Alba, 841 F. Supp. 868, 870 (N.D.Ind. 1994); Brown v. Booker, 622 F. Supp. 993, 996-97 (E.D.Va. 1985). But as illuminating as Barefoot was, it had not explicitly defined (as a practical matter) what a "substantial showing" entailed. Aside from the requirement that the claim not be frivolous, and that it be debatable amongst jurists of reason, Barefoot, 463 U.S. at 892, 893 n.4, many federal courts simply granted or denied CPCs based on whether the petitioner would likely prevail on the merits. See McCoy v. Lynaugh, 874 F.2d 954, 967 (CA5 1989); see also Stephenson v. Witkowski, 1991 U.S. App. Lexis 30228 (CA4 1991)(unpublished).

Then came Lozada v. Deeds, 498 U.S. 430 (1991). There, the Supreme Court held that a defendant can show the debatability of an issue if another court has

decided the claim differently (favorably) than that decided by the court from which his claim was denied. Id. at 432. Since then, several courts–post AEDPA, have followed this general principle. Cf. Allen v. Ornoski, 435 F.3d 946, 951 (CA9 2006); Wade v. Robinson, 327 F.3d 328, 334-35 (CA4 2003)(Gregory, J., concurring). Furthermore, several courts have opined that novel issues, or issues of first impression, may be enough to demonstrate that the issue deserves encouragement to proceed further. See U.S. v. Thomas, 713 F.3d 165, 169 (CA3 2013); Ramos-Martinez v. U.S., 638 F.3d 315, 318 & 320 (CA1 2011). Viewed against this liberal backdrop, the number of COA's that are actually granted is staggering. So much so, that a habeas practitioner just recently asked the Supreme Court to do something about it.



> *"I encourage all habeas corpus litigants to focus their applications for COA on contrary rulings from other courts or, on issues of first impression."*

In a petition for writ of certiorari filed by Jonathan Laurens, of Kansas City MO, Johnson v. United States, Laurens-87 (2014)(ruling below 8th Cir., 5/2/14), Mr. Laurens asked the Supreme Court to decide whether the 'reasonable jurists' test was being faithfully administered in circuits such as the Fourth, which has cited to the test 7,541 times since 1996, while rejecting 7,522 applications for COA (99.75 percent), or in the Eighth, which has held that even its own dissenting judges who vote for a COA do not qualify as reasonable jurists. 95 CLR (BNA) 19 (Aug. 13, 2014). Unfortunately, the Supreme Court did not grant review to address these staggering numbers (and indefensible trends). Habeas litigants are left, therefore, with very little, or simply no review, of the denial of habeas corpus petitions. This is true even in instances where a contrary ruling has been issued by another court. For example, I recently had the pleasure of representing a federal prisoner (we will call him Mike for purposes here) on section 2255. His claim was simple: Counsel was ineffective for providing material misinformation during plea discussions. Specifically, Mike wanted to plead guilty before the commencement of trial, but was told by his attorney that the only way that he could plead guilty was to testify for the government. Mike refused and was subsequently convicted at trial. On section 2255, we

argued that counsel's advice was erroneous because Mike had the right to plead guilty to the indictment as charged. In other words, he had the right to enter an unconditional guilty plea (without the Government offering a plea agreement). See In re Vasquez-Ramirez, 443 F.3d 692, 695-96 (CA9 2006)(a court must accept an unconditional guilty plea); U.S. v. Martin, 528 F.3d 746, 750 (CA10 2008); Fed. R. Crim. P. 11(a)(1). The District Court nor the Government disagreed with this general proposition. See Padilla v. Kentucky, 176 L.Ed.2d 284, 296 (2010)(the duty to "give correct advice is [] clear"). That concession, therefore, effectively removed the performance prong of the Strickland test as an issue. See Strickland v. Washington, 466 U.S. 668, 687 (1994).

The District Court concluded, nevertheless, that Mike was not entitled to relief because, in the Court's view, his protestations of innocence cast serious doubts on his claim that he would have pleaded guilty if he had been correctly advised by counsel. In our application for COA, we argued that while the 7th Circuit had not yet addressed the question of whether a defendant's protestations of innocence are enough, standing alone, to defeat his later claim that he would have pleaded guilty, the Second, Sixth, and Eighth circuits had. Compare Griffin v. U.S., 330 F.3d 733, 738 (CA6 2003)(defendant's "repeated declarations of innocence" do not prove that he would not have pleaded guilty); Mask v. McGinnis, 233 F.3d 132, 142 (CA2 2000)(protestations of innocence not dispositive), with Sanders v. U.S., 341 F.3d 720, 723 (CA8 2003)(claims of innocence undermined defendant's later claims that he would have pleaded guilty). See also North Carolina v. Alford, 400 U.S. 25, 33 (1970)(holding that guilty plea is not inconsistent with a claim of innocence *Continued on page 30...*

*Continued from page 29*

because "reasons other than the fact that [a defendant] is guilty may induce a defendant to so plead")(internal citation and quotation marks omitted). Despite our presentation of these precedents, the District Court denied the application for COA without so much as a footnote addressing the contrary rulings in Griffin, Mask and, by implication, Alford. But see Hernandez v. Johnson, 213 F.3d 243, 248 (CA5 2000)(an issue is debatable if another court could resolve the issue differently). Of course, we applied to the 7th Cir. for a COA based on these contrary rulings. The application remains pending.

In short, and based upon my 21 years of incarceration, I encourage all habeas corpus litigants to focus their applications for COA on contrary rulings from other courts or, on issues of first impression. Simple recitation and rehashment of the merits of the claim that was presented in the district court is, by all accounts, insufficient to persuade a reviewing court that your claim deserves encouragement to proceed further. Slack, 529 U.S. at 484.

By: Corey L. Woodfolk
#30079-037
FCI Otisville
P.O. Box 1000
Otisville, NY 10963

### STEP IN MY SHOES

You think you have it so bad, take a step in my shoes.
Sleep where I sleep, experience my blues.

Hear my whispers of joy, and you'll fall upon death ears.
Wait around to see me smile and you'll be waiting for years.

Walk a mile in my shoes, and you'll be looking for the sun.
I'm blinded to happy feelings; I'm lost from having fun.

Feel the pain that I feel and you'll know you have it better.
Walk a mile in my shoes and you will be walking through bad weather.

You claim you have it bad with the little trials that you face.
Stop just for a moment, come and take my place.

Until you've walked a mile in my shoes you life doesn't compare
If you think that you can live the life that I lived,
You don't have a prayer.

You clap your hands together enjoy our happiness,
My hands are clasped together with chains around my wrist.

Life is a journey, one to be enjoyed, if your living your life
Like mines, it is your life that will be destroyed. "

Jimmi, James Banzaca 06866-017



Forum for the Often-Silenced Voices From

# BEHIND THE WALL

The finding is that the chameleon and I we exist harmonious,
both are unaffected by the physics of color,
but our likenesis anonymous.

The vegan in me..... Yet to an insect it is ominous.

If colors had been the unknown weakness, being without——
that is prominence, the clear vision unconstrained, that is dominance.
That is translucence———— clearly depicted, said so by the black skin
..... in front of a black judge———— Duly convicted.

Know that the smudge of this rainbow...
It is truly afflicted. It's faction to the line that was true to the picket,
true to solicit...
The oneness of shade I find valor in culture,
where there is an " S "I'm afraid,
assuming color to be whiskey, then me I am staid.

Me I am conscious and dreaming by deliberation,
in an electrified rhythm of my heart beating without defibilation.
To breathe that is invigoration, So I breathe..

An air that has no color, through a dictate of destiny that has no other,
Because our skin... it should have no cover Slad by this.... cause said,
where's the negro he's my brother.
Is where color has no jurisdiction,
because the imaginary border is the purest of fiction.
Recognizing black from white, doesn't cure the addiction.

Thus I am high— naturally.
Why be separated when we don't have be,
See..... I am black and white, actually.
An interracial woman that remains to be colorless..

Written by Gregory J. Morse

Excerpts from Mental Crack # 1
No more than one poem a day

Ellen Johnson Sirleaf — If your dreams do not scare you, they are not big enough."





U.S. Department of Justice

Federal Bureau of Prisons

*Federal Correctional Institution, McKean*

P. O. Box 600
Otisville, NY 10963

May 15, 2015

To Central File:

This is a letter of recommendation for Mr. Corey Lorenzo Woodfolk, register number 30079-037.

Mr. Woodfolk has been incarcerated at FCI Otisville, Otisville, NY, since January 28, 2008. He has maintained employment as a Unit Orderly since November 2, 2011, where he consistently receives good performance evaluations. Mr. Woodfolk's supervisor has noted is an excellent worker and often does more than he is required.

Mr. Woodfolk was awarded a Certificate in Paralegal Studies with Distinction from the Blackstone Career Institute.  His paralegal studies included 900 clock hours of coursework required to sit for the Certified Paralegal exam.

Mr. Woodfolk has participated in the Victim Impact Program which is a 16 week program designed to assist offenders in learning about various crimes and the impact it has on victims.  They learn how to accept responsibility for their past actions and how to accept responsibility for their past actions and how to positively contribute to their communities in a way that will help prevent future victimization.  They learn this through instruction and by participating in Victim Impact Panels so they can hear the impact their behavior has had on others.  He completed this program in May 17, 2012.  Mr. Woodfolk completed the Young Men Incorporated Leadership Training Academy, in 2011 that provided him the opportunity to be a mentor and facilitator.  As a mentor, he has provided guidance and counseling to younger inmates to assist their preparation for reintegration into society.  It should also be noted, Mr. Woodfolk has productively used his leisure time to complete hundreds of hours of course work in the education department which includes various adult continuing education such as A Framework for Recovery, The Transcending Addiction Course, Modern Residential Wiring, Commercial Driver's License, Food Preparation, Money Matters and Real Estate Mortgage Broker.  He is currently in the Fork Lift Training Class.

Mr. Woodfolk has displayed eagerness and willingness in learning and has completed all tasks asked of him.  He continues to seek out additional programming to further his knowledge and practice living a responsible lifestyle.

This letter is to document Mr. Woodfolk's commitment to change and desire to successfully re-enter society.

Sincerely,

M. Recktenwald
Warden



Honorable J Frederick Motz,

July 1, 2015

I met Corey Lorenzo Woodfolk in 1987. Four years after I was blessed to like, love and marry my best friend on December 02, 1991. Corey, has inspired me to be an amazing wife, and friend. His still makes decisions for our future, far as my career, my education, and for our children. He's very influential with any decisions that we make as a family. Corey is our strength and direction.  He has become very humble over the years.  It has been an extreme pleasure to witness this man get his degree, and represent himself in the Federal Court system. Family is very important to the both of us. We share the same values and beliefs when it comes to our family.  We can always count on Corey in every aspect of our lives, and he's always right there to lend a hand. He helps his children and sisters with their projects for college. No one in the family wants to let him down ever. When he speaks he speaks volumes.

 Corey, has blessed me with 2 children who has become extraordinary young men. I am their mother not their father. I lack the physical, emotional, social, and spiritual contribution and commitment of a father that gets handed down to his children. I am a mother who has trusted God to make up the difference, leaned on the wisdom of my husband and worked overtime as a woman to attempt to fill in the gaps.  Corey, is an amazing man and father. Corey's absence for 22 years has put a great deal of pressure on myself and my 2 sons. The elder son has been incarcerated and addicted to pills. He is now in recovery with 2 beautiful children. The youngest son was a year old when Corey left us. Only knowing his father during visits and phone calls.  Growing up without his dad to teach or show him how to be a man depressed him. He graduated with honors from Baltimore Polytechnic Institution. He furthered his education at Delaware University and dropped out in his 2nd year due to finances.  In Corey's absence he has been a tower of strength and a strong force for me raising my boys alone. I cannot fathom another 22 years without this man.

Sincerely,

Lisa Woodfolk
24 North Ellamont Street
Baltimore Maryland 21229

Terry Woodfolk

6732 Fox Meadow Rd

Baltimore, Maryland 21207

June 24, 2015

Dear Honorable Judge Fredrick Motz,

Corey L. Woodfolk has always been a caring, loving, and resourceful brother. Even in the midst

of all the dysfunction in our family. Mother, aunts, and uncles using and abusing drugs in our

household. We experienced almost everything that comes along with living with practicing

addicts. My grandfather who was the backbone in our family passed away suddenly when we

were  just 15 years of age. Corey was passionate that he had to protect the family at a young age.

Ultimately, turning to the streets, Corey has paid the ultimate price for the negative

choices he made. Although he has been gone for 20 years, we are as active in each other lives as

we can be. Most of my family has passed on and the new generation which is I, my sister and our

kids are thrieving. I turned to drug usage for a brief period of time in my life. I sought for help

and have 20 years of sobriety and I'm a business owner, and also a productive member of

society. Our children are now attending college. I've recently graduated with my associate's

degree in Human Resources. Corey also recently obtained his paralegal degree from Black Stone

University, which I and my sister funded because we believe in his abilities. We have all had

many years to mature in faith and prosper in life, as well as be role models in our family.

Corey Woodfolk has spent most of his childhood and young adulthood locked up. I think

Corey would be very productive in our community. He can mentor and attempt to serve our

Terry Woodfolk

6732 Fox Meadow Rd

Baltimore, Maryland 21207

June 24, 2015

young people that are at risk of facing jail time, being institutionalized and even facing death. It

is my prayer that Corey will one day get that opportunity. Corey regularly calls home to help

guide our sons and daughters on the right path by telling his story and hoping they won't make

the same mistakes he did. Thank you in advance for your consideration.

Sincerely,

*[signature]*

**Terrys Tiny Tots Daycare**
6732 Fox Meadow rd Baltio. MD 21207
410-281-9766

Sherry Wood Silk Carrington
9733 Eustice Rd
Randallstown MD
21133
7-7-15

Dear, Honorable Judge,

I am writing on behalf of my brother Cory Warfield. All of our child hood was filled with drugs, prostitution, guns and any other desfunction you can think of. My mother used drugs all of our growing up. We watched her, my aunt and uncle shoot drugs. We watched all kinds of men run in and out our doors. I can remember being put out of each home we lived in with my mother. We were also raised at my grandmothers home. Once we were put out of several homes. My grandfather passed away and that was the end of a safe home at grandma house, my grandmother let some young men use her house as a drug herese to store their stash, they ran in and out our home all day long until one day our house got raided and my grandmother was arrested. Our door was kicked in by the police and as a result we were unable to lock the door so I had to stay in the house unsafe, scared to sleep.

When I looked back over my life I thought it wasn't that bad but it was because it really affected my brother and twin sister more. They both used drugs and my sister still to this day have alot of mental issues that she has a psychiatrist. It has also affected my brother in his life style, from doing drugs to getting arrested. Also, my dad was never really around because he sold drugs all our life too. My brother didn't have a good role model to follow except my grandfather but he died when we were young.

Thanks for

Sherry Woodfolk-Carrington

Shaunte Woodfolk

3 Duke of Windsor Ct #101

Baltimore, MD 21207

Dear Honorable Judge Motz,

My name is Shaunte Woodfolk niece of Corey Woodfolk. I am currently 25 years old, with a 3 year old

son. When I was two or three years old my uncle Corey was sentenced to 50 years in prison. I spent my

life time building a relationship with him behind bars. Even with this barrier I couldn't be any closer to

him. I come from a small family with big problems. Every adult member of my family has formally and/or

still is stricken with drug abuse and/or incarceration for drug related crimes. My mother and

grandmother suffered years of drug abuse along with my great aunts and uncles, all of whom lived in

the same home. The home they all lived in was in the inner city of Baltimore where drug dealing and

using drove the community. My life specifically was affected by drug use because my mother was a drug

user. There were many days in nights I at a very young age fought with my mother to get her life

together. I could tell the difference in her when she was "high" even though she masked that life from

me the best she could. By age 6 my mother was active in recovery from drug abuse and had started to

attend a church. My grandmother also was a victim of drug abuse, she used drugs a lot of my mother

and aunts and uncles child life. During her time using drugs she had become infected with HIV. During

her road to recovery she dedicated her life and recovery to her family, HIV awareness, and living a life

pleasing to God. My grandmother before her death due to Pancreatic Cancer in 2008 had been clean for

20 plus years. My mother prior to my grandmother's death had been clean for over 15 years. During our

period of grieving my grandmother the matriarch of our family dying it was a very hard time for

everyone. Particularly my mother became depressed, irrational, and felt emotionally incapacitated

once she seemingly lost everything in my grandmother, as well as divorcing her husband of 10 years. At

that time I was about 19 years old I had graduated from high school and started college. I after one year

of college I transferred from a college in DC to UMBC in Baltimore County to be closer to home because I

seen that things were falling apart. My mother took a stint back to drug use for about 6 months to a

year. This was tough to watch since it was like déjà vu to me. I was very disappointed and our

relationship suffered. Through all of the years of recovery we all found a peaceful place in God and

ministry. We all collectively joined my current church Faith Christian Worship Center about 19 years ago

and God has been our family's saving grace. We have committed life to family and ministry. Through the

Pastor Gary G. Johnson

700 North Pulaski Street

Baltimore, Maryland 21217

July 1, 2015


Dear Honorable Judge Fredrick Motz,

I am writing this on behalf of the late Deborah T. Woodfolk (Debbie), the mother of Corey Woodfolk. Debbie served as deaconess at Faith Christian Worship Center (FCWC) for 10 years. I can attest to Debbie expressing one of her reasoning for turning her life around and living a life of sobriety was to help support her son during his time of incarceration. Debbie raised her niece Destiny Woodfolk who currently lives with Terry Woodfolk, after Debbie passed. All of which are dedicated members of the Church FCWC. She did this for as long as I've known her preceding her death.  Debbie would often express her regret of not getting clean sooner to be there for her children. She would speak of Corey as a fine, clean cut young man who made a bad decision. I can also attest that one of her great desires was to see her son come home. Unfortunately in 2008 Deborah Woodfolk passed from pancreatic cancer. This was a tragic lost to Corey as well as rest of the family. Debbie Woodfolk lived the last 15 years of her life committed to herself, her church, and her family. She was an absolute delight. Although I did not have the pleasure of meeting Corey, knowing his family I believe he has the potential to turn his life around just as Terry Woodfolk and Deborah Woodfolk did.

Sincerely,

410 963-9719
4102335072

Honorable J. Frederick Motz,

July 1, 2015

I am Jamil horey Woodfolk, youngest son of Corey Lorenzo Woodfolk. This letter has taken me quite some time to complete, simply because I could praise my father's character infinitely. So, with that being said I plan to make my testimony here, "Short and Sweet". To begin I will say that I am nothing short of proud to be able to claim my right as his son. He has been a great role model for me for the last 21 years despite his disposition.

The streets put my father in jail when I was two years old and from the time I can remember he has been telling me to stay away from them. I know my father through early childhood and teenage visits but mostly from direct phone conversation. He made sure that he and I could maintain a great father/son relationship, even more so than a lot of my peers that I grew up with. Growing up in the inner city of Baltimore,

not having a father figure present was very
common. Not having a father became so common that
those rare kids who did have one were ridiculed.
However, I had a father! Physically? No. Emotionally
and ~~more~~ spiritually? Yes! My father has yet to miss
a moment in my life, unlike many others. We
both wish that he could have been here to
actually see and not just hear but I appreciate
his effort nonetheless.

   When it comes to family my father loves
nothing more. At this point in his life and for a
very long time now he has been very warm hearted.
All he talks about is family, what he wants to do when he is
released, love, and wisdom. He constantly motivates me and
I'm sure he does the same for others. He is honestly
the reason why I will never sell drugs despite my
upbringing and environment. He has never praised nor glorified
the street life to me, yet always conditioned my perspective to
lull towards school. I've graduated from Baltimore
Polytechnic Institute, and attended both Morgan State and
Delaware State Universities. I strive for greatness to
make this man proud!

I've probably said too much as of now
but I'll point out several vital points to end my
excerpt. My father has ALWAYS been there for
me, despite being incarcerated since I was an infant.
I have no recollection of him being outside of a
State facility. I've always said, "Seeing my father
outside of jail would be like seeing Jesus to me".
Yes, it is that unfathomable. He motivates me in all
aspects; career, vision, personal life, etc... He is the
guiding light for my family. He is extremely intelligent
and I'm not speaking from a biased view, the man
is intelligent, clever, wise, quick and witty. He is
nothing short of a contender to the more powerful
people of todays society. One could compare his
transformation from the time he entered jail in 1994
to now to that of a freshman entering college
and graduating years later with their Master's degree.
I mean, the man is completely reformed; mind, body
and soul. I'm not familiar with the young, dangerous,
street running Corey that most may recall. However, I
am very intertwined with the wise, old as dirt,
caring old man that he is today.

My father coming home would change not only
my life for the better but my whole family.
We could finally, "Go to Disney World" as he used
to promise to me when I was a young boy.
If there is anything that you can do within
your power to help him, it would be more than
greatly appreciated. Thank you for your time and
consideration, we all thank you.

Sincerely,

Jamil Lany Wright

24 N. Ellamont Street
Baltimore, MD 21229

July 1, 2015